UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ISAAC RODRIGUEZ,<br><br>        Plaintiff,<br><br>      v.<br><br>NIKE RETAIL SERVICES, INC.,<br><br>        Defendant. | Case No. 5:14-cv-01508-BLF<br><br>**ORDER GRANTING MOTION FOR CLASS CERTIFICATION**<br><br>[Re: ECF 44, 51] |

These days, more and more places inspect you when you walk in: airports. Stadiums. This courthouse. Nike stores, on the other hand, want to inspect you when you walk out—or at least, they do if you're an employee. Plaintiff Isaac Rodriguez alleges that while working at one of Defendant Nike Retail Services, Inc.'s ("Nike") stores, he was required to be inspected when he left work but was not compensated for the time he spent being inspected or waiting to be inspected. He now sues Nike on behalf of himself and others similarly situated and moves to certify a class. Nike both opposes his motion and moves to deny class certification. After considering the arguments presented at oral argument and in the briefing on both motions, the Court GRANTS Rodriguez's motion and DENIES Nike's motion as moot.

**I.    Background**

Nike operates dozens of retail stores in California. *See* McPike Depo. at 171:23-172:4, Lee Decl. Ex. A, ECF 51-1. Like many other businesses, Nike uses a time clock system to track employees' work hours. Nike store employees punch in and out of work on a time clock, and they are paid based on the time recorded by the time clock. *See id.* at 39:1-6. When an employee leaves the store at the end of a work shift or during a break, she must clock out and then go to the store exit to get herself and her bag inspected before she can exit the store. *See id.* at 72:23-73:8. In other words, the inspection happens after the employee clocks out. *See id.* at 73:9-14.

When Nike store employees leave the store at the end of a work shift or during a break, they must get inspected or checked at the store exit. *See id.* at 50:2-11, 73:4-8. The inspection is to deter employees from stealing and to keep managers apprised of who is in the store, and so all employees must be inspected before they leave, whether or not they are carrying a bag. *See id.* at 94:6-10, 95:5-16. If an employee is not carrying a bag, a box, or something similar, then a manager will visually check the employee. *See id.* at 94:24-95:16. If the employee is carrying a bag, box, or something similar, then the manager will ask the employee to open it to see whether there's "anything dangerous in there or anything unpaid for in there upon exiting." *Id.* at 94:15-23.

Only managers, supervisors, and contract security may perform the inspection. *See id.* at 75:15-24, 76:14-22. Because all employees must be inspected before leaving the store, if an employee wants to leave but no one is available to do the check, the employee must wait at the door until someone is available. *See id.* at 82:7-21. But because the employee already has clocked out before going to the store exit to get checked and then leave, any time she spends waiting for the mandatory check or getting checked is not recorded by the time clock. As a result, the employee is not automatically compensated for this time, which is mandated by Nike's exit inspection policy.

During deposition, Jeffrey McPike, Nike's 30(b)(6) witness, testified that Nike has a remedy for this dilemma of uncompensated but mandatory time. He stated that "it is the employee's responsibility to alert the manager of any time waiting," and that Nike pays employees for this time. *Id.* at 82:18-21. Nike's waiting time policy is set forth in Nike's Employee Handbook. *See id.* at 82:22-25. Based on both the written policy itself and store managers' testimony and declarations about it, however, it is far from clear that Nike always pays employees for time spent waiting. The Employee Handbook states,

> **Work Time and Hours Worked – Non-Exempt**
>
> Work time includes more than hours actually worked. It also includes the time an employee is required to be on duty at a prescribed workplace or on Nike premises.
>
> Some of the categories below may qualify as actual hours worked depending on the circumstances:

- Preparatory or Finishing Activities
- Waiting Time
- On-Call Time
- Training, Lectures, or Meetings
- Volunteer Activities, Civic or Charitable Work
- Travel Time
- Meal Periods and Rest Breaks

Contact your Business HR Generalist, Employee Relations Specialist or Compensation Specialist if you have any questions about whether time qualifies as hours worked.

Nike U.S. Employee Handbook at 32-33, McPike Depo. Ex. 110, Harel Decl. Ex. B, ECF 44-1. The policy does not define waiting time. It does not mention time spent in exit inspections or waiting to get inspected, and it does not state that such time counts as waiting time. It also does not explicitly state that waiting time will be compensated. Instead, it says that some categories, such as waiting time, "may" qualify as actual hours worked.

The ambiguous nature of the waiting time compensation policy is borne out by the inconsistency with which employees are compensated for time spent in exit inspections or waiting for exit inspections. Several Nike managers and supervisors submitted declarations stating that they had adjusted employees' time records so that employees were compensated for time spent waiting for bag checks. Brian Aquino, an Assistant Head Coach at a Nike store in Petaluma, stated,

> One of the reasons I may adjust an employee's time is for time the employee spends waiting for a bag check after clocking out. For example, if I either cause an employee to wait for a bag check or observe or hear that an employee was required to wait for a manager to meet him or her at the front exit door for a bag check, I may adjust the employee's time depending on the circumstances. On several occasions, I have adjusted time for employees who have been required to wait for more than three to four minutes for a manager to arrive to perform a bag check.

Aquino Decl. ¶ 5, ECF 53-1. Kenny Hilger, who worked in supervisorial positions at three Nike stores, stated that he adjusted employee time cards due to bag check waits on two occasions. *See* Hilger Decl. ¶ 10, ECF 53-1. Megan Roos, an Assistant Head Coach at Nike's Vacaville store, has adjusted employee time cards due to bag check waits "a handful of times." Roos Decl. ¶ 10, ECF 53-1. Roos's Head Coach trained her and other managers "to adjust an employee's time for time the employee spends waiting off the clock." *Id.* Michael Lanning, the Head Coach at the Vacaville store, has adjusted employees' work time due to bag check waits three or four times.

3

Lanning Decl. ¶ 7, ECF 53-1.

While these declarations suggest that Nike, or at least some of its managerial and supervisorial staff, compensates employees for time spent waiting for exit inspections, there is no explicit policy, written or unwritten, that states that waiting time is compensable. This is borne out by testimony from Nike managers, who varied in their understanding of the policy, how long employees had to wait before their time was compensated, and what they did when an employee had to wait for an inspection. Hilger, who adjusted time cards for bag check waits on two occasions, nonetheless testified that the waiting time policy does not state that time spent waiting for the bag check is compensable. *See* Hilger Depo. at 78:2-79:6, Supplemental Lee Decl. Ex. B, ECF 60-3. The policy merely tells employees "who to contact if they believe they should be compensated for their waiting time." *Id.* at 79:3-6. Cynthia Krieger, a Head Coach in San Francisco, was similar to Hilger: she testified that she was not aware of any Nike policy saying that time spent waiting for a bag check is compensable, but also testified that she believed managers had discretion to compensate. *See* Krieger Depo. at 42:9-17, Supplemental Lee Decl. Ex. L, ECF 60-3. Jennifer Greer, a Head Coach in Livermore, likewise testified that it was "not specifically stated in our policy" that waiting time for a bag check should be compensated. Greer Depo. at 30:25, Supplemental Lee Decl. Ex. F, ECF 60-3. But, she said, "Our policy pretty open." *Id.* at 30:25-31:1. She testified that from her perspective, waiting more than five minutes for a bag check would be excessive. *Id.* at 31:2-6. The policy does not provide the five minute number; rather, she got that number from another Head Coach. *See id.* at 31:7-18. In contrast to Greer's five minutes, David Voigtlaender, a Head Coach in San Ysidro, thinks that "three minutes or more" would merit an adjustment. *See* Voigtlaender Decl. ¶ 18, ECF 44-1. He has "never adjusted someone's time," however, because he has "not seen a situation where an employee had to wait . . . ." *Id.*

Meanwhile, Oliver Alpuche, a Head Coach in Los Angeles, testified that he was not aware of any Nike policy stating that bag check time should be paid. *See* Alpuche Depo. at 80:6-8, Supplemental Lee Decl. Ex. G, ECF 60-3. When asked if he thought employees should be compensated for the time it takes to undergo a bag check, he said that in his "personal opinion, for

4

the five seconds that it takes [him] to do a Bag Check, [he does] not think they would be compensated for it." *Id.* at 80:12-16.

Ryan Foss, a Head Coach in Petaluma, had a third approach: he testified that if an employee complained too long about waiting for a bag check, or if he believed that the employee had waited too long, he "[didn't] think [he] would" automatically compensate the employee for that time, but would inquire with Nike as to the proper course of action. Foss Depo. at 60:17-61:13, Supplemental Lee Decl. Ex. C, ECF 60-3.

Finally, Roberto Pocasangre, an Assistant head Coach in Santa Monica, testified that he had not seen a policy allowing managers to adjust time for bag check waits. *See* Pocasangre Depo. at 57:2-8, Supplemental Lee Decl. Ex. H, ECF 60-3. He was not alone—Paul Ramos and Michael Cornwell, both former Assistant Head Coaches, declared that they were "never trained nor told in any way that time spent waiting by employees for security checks was compensable." Ramos Decl. ¶ 5, ECF 60-6; Cornwell Decl. ¶ 5, ECF 60-4. As a result, they "never considered going back into an employee's time records to adjust his/her time and pay them for time spent waiting for security checks." Ramos Decl. ¶ 5, ECF 60-6; Cornwell Decl. ¶ 5, ECF 60-4. Alex Whye, another former Assistant Head Coach, also was never trained or informed that security check waiting time was compensable, and never adjusted an employee's time records for security check waiting time. *See* Whye Decl. ¶ 5, ECF 60-5.

During discovery, Nike produced a list of the upward time adjustments of one to fifteen minutes that were made to employees' time cards during the class period. *See* Response to Pl.'s Third Set of Requests for Production of Documents at 3-4, Supplemental Lee Decl. Ex. A, ECF 60-2. Nike also produced a list of all time card adjustments, both upward and downward, that had notes regarding the adjustments. *See id.* Nike's internal timekeeping records show that 190 different managerial employees made a total of 571 upward time adjustments to employee time cards during the proposed class period. *See* Ross Decl. ¶ 4, ECF 53-1. These upward time adjustments affected employees at 31 of the 35 Nike California stores that were open during the proposed class period. *See id.* at ¶ 5; Nelson Decl. ¶ 5, ECF 53-1. Nike's timekeeping system allows users to make a note when adjusting a time card; while most of the records do not have any

notes, some of them do. *See* Time Punch Adjustments, Supplemental Lee Decl. Ex. A, ECF 60-2. The entries with notes show that the reasons for the time adjustments varied: one employee's time card was adjusted "because her mother was in town" and so she asked "to go home early." *Id.* at NRS000451. At least six time cards were adjusted because the opening manager was late. *See id.* at NRS000453, NRS000459, NRS000469, NRS000478, NRS000511, NRS000551. Other reasons for adjustments were that employees took extended shifts, changed shifts, missed punches, were on time, were late, left early, or stayed late. *See id.* at NRS000453, NRS000457, NRS000460, NRS000462, NRS000463, NRS000464, NRS000466, NRS000467, NRS000468, NRS000469, NRS000475, NRS000480, NRS000481, NRS000482, NRS000488, NRS000489, NRS000490, NRS000491, NRS000493, NRS000494, NRS000500, NRS000503, NRS000505, NRS000508, NRS000514, NRS000517, NRS000520, NRS000521, NRS000522, NRS000524, NRS000526, NRS000527, NRS000529, NRS000534, NRS000537, NRS000538, NRS000548, NRS000558, NRS000565, NRS000566, NRS000573, NRS000578. Other adjustments were made because the time clock system malfunctioned. *See id.* at NRS000476, NRS000477, NRS000480, NRS000493, NRS000511. None of the notes state that the time adjustment was made because of time spent waiting for an exit inspection, or time spent during an exit inspection.

  Rodriguez worked at Nike's Gilroy store for two months, from Nov. 11, 2011, to Jan. 11, 2012. *See* Rodriguez Decl. ¶ 2, ECF 51-5. While he worked there, he was instructed that he had to go through a security inspection or bag check at the end of each work shift. *See id.* ¶ 3. At the end of his shifts, he clocked out, went to the front of the store, and waited for a manager to conduct a visual security inspection. *See id.* ¶ 4. He declares that security checks generally took ten to fifteen minutes to complete, from the time he clocked out to the time he left the store. *See id.* ¶ 6. All of this time was off the clock. *See id.* ¶ 7. He sues Nike on behalf of himself and others similarly situated, raising claims for (1) failure to pay minimum wages in violation of Cal. Labor Code. §§ 1194, 1197; (2) failure to pay overtime wages in violation of Cal. Labor Code §§510, 1194; and (3) unfair and unlawful business practices in violation of Cal. Bus. Prof. Code §§ 17200, et seq. He now moves under Rule 23(b)(3) and asks the Court to certify a class of

  All current and former non-exempt retail store employees of Defendant who

worked in California during the period from February 25, 2010 to the present.

Pl.'s Mot. at 7, 14-15, ECF 51.

Nike opposes, arguing that Rodriguez has not satisfied the requirements of Rule 23(a) and Rule 23(b)(3). *See* Def.'s Opp. at 15-24, ECF 53. Nike makes three overarching arguments in support of its positions on Rule 23(a) and 23(b)(3): first, Nike's waiting time policy means that exit inspections are not off the clock work; second, employees are not working when they have clocked out and are waiting for an exit inspection; and third, the exit inspections take only a de minimis amount of time. *See id.* at 2-15. Because these larger arguments are the foundation for Nike's opposition to class certification, the Court considers these arguments first and then turns to whether Rodriguez has satisfied Rule 23.

## II.     Nike Does Not Have a Policy Providing Compensation for Bag Check Waiting Time

Nike argues that class certification is inappropriate because it has a policy prohibiting off the clock work and a written policy providing payment for time spent in exit inspections. *See* Def.'s Opp. at 2-6. It argues that the waiting time policy in the Employee Handbook provides pay for waiting time, including time spent in exit inspections, and points to the 571 upward time adjustments and store managers' declarations that they have adjusted employees' time cards to compensate them for time spent waiting for bag checks. *See id.* at 2-4. Given this policy, says Nike, class certification would be inappropriate under *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th 1004 (2012), *Ortiz v. CVS Caremark Corp.*, Case No. No. C-12-05859 EDL, 2013 WL 6236743 (N.D. Cal. Dec. 2, 2013), *Cornn v. United Parcel Serv., Inc.*, Case No. C03-2001 THE, 2005 WL 2072091 (N.D. Cal. Aug. 26, 2005), and *In re AutoZone, Inc., Wage & Hour Employment Practices Litig.*, 289 F.R.D. 526 (N.D. Cal. 2012). *See* Def.'s Opp. at 4-6, ECF 53.

Nike's arguments are unconvincing, however, because it does not have a written policy providing for payment for time spent in exit inspections. The waiting time policy in the Employee Handbook does not provide pay for time spent waiting for exit inspections or getting inspected. The policy says that "some" of the categories listed in the Employee Handbook's work time policy "may" qualify as actual hours worked, "depending on the circumstances," and identifies "Waiting Time" as one of those categories. Nike U.S. Employee Handbook at 32-33, McPike Depo. Ex.

7

1  110, Harel Decl. Ex. B, ECF 44-1.  This is not a policy stating that employees will be paid for time
2  spent waiting for exit inspections or getting checked; rather, it is a statement that waiting time
3  might qualify as actual hours worked, depending on the circumstances.  The policy does not define
4  waiting time, and it does not mention exit inspections or state that time relating to exit inspections
5  is waiting time.  Nor does the policy explain the circumstances under which waiting time will be
6  compensated.

7  The ambiguity of the Employee Handbook's waiting time policy is reflected in how Nike
8  store managers actually implement the policy.  Some managers submitted declarations stating that
9  they had adjusted employee time cards due to bag check waits, but other managers submitted
10 declarations stating that they were never trained or told that time spent waiting for bag checks was
11 compensable and so they never considered adjusting employees' time cards to account for time
12 waiting for bag checks.  *See* Aquino Decl. ¶ 5, ECF 53-1; Hilger Decl. ¶ 10, ECF 53-1; Roos Decl.
13 ¶ 10, ECF 53-1; Lanning Decl. ¶ 7, ECF 53-1; Ramos Decl. ¶ 5, ECF 60-6; Cornwell Decl. ¶ 5,
14 ECF 60-4; Whye Decl. ¶ 5, ECF 60-5.  Several managers—including one that had adjusted time
15 cards for bag check waits—testified either that they were not aware of any policy stating that bag
16 check waiting time was compensable or that the waiting time policy did not specifically state that
17 such time should be compensated.  *See* Hilger Depo. at 78:2-79:6, Supplemental Lee Decl. Ex. B,
18 ECF 60-3; Krieger Depo. at 42:9-17, Supplemental Lee Decl. Ex. L, ECF 60-3; Greer Depo. at
19 30:25-31:6, Supplemental Lee Decl. Ex. F, ECF 60-3; Alpuche Depo. at 80:6-8, Supplemental Lee
20 Decl. Ex. G, ECF 60-3; Pocasangre Depo. at 57:2-8, Supplemental Lee Decl. Ex. H, ECF 60-3.
21 The waiting time policy's lack of clarity is highlighted by Foss, who testified that if an employee
22 had waited too long for a bag check, he would inquire with Nike as to the proper course of action
23 rather than automatically compensating the employee for the time.  *See* Foss Depo. at 60:17-61:13,
24 Supplemental Lee Decl. Ex. C, ECF 60-3.  The managers' varied understandings of whether Nike
25 had a waiting time policy that made time related to exit inspections compensable shows that there
26 was no uniform policy, written or unwritten, about whether employees should be paid for time
27 related to bag checks.
28 Nike states that numerous managers made time adjustments to compensate employees for

time spent waiting for exit inspections, and then states that company records show that there were 571 upward time adjustments made during the proposed class period. *See* Def.'s Opp. at 3-4. Nike thus implies that all 571 adjustments were for exit inspection waiting time, but nothing in the time adjustment records supports that inference. The two statements—that some managers compensated employees for exit inspection waiting time, and that there were 571 time adjustments during the class period—are completely unrelated. Most of the upward time adjustments lack notes explaining the reason for the adjustment, but the 131 time adjustments that do have notes were not for exit inspection waiting time. Those adjustments were for shift changes, time clock malfunctions, employees arriving late, employees arriving early, managers arriving late, and a variety of other reasons, such as employees clocking in on time but loitering in the break room rather than immediately starting work. *See generally* Time Punch Adjustments, Supplemental Lee Decl. Ex. A, ECF 60-2. The 571 upward time adjustments during the class period are evidence only that there were 571 upward time adjustments during the class period—not that all or most of them were for exit inspection waiting time, or that Nike managers consistently adjusted time cards for exit inspection waiting time.

In short, Nike does not have a policy providing payment for time spent for exit inspections. In light of that, the four cases—*Brinker*, *Ortiz*, *Cornn*, and *In re AutoZone*—that Nike cites are inapposite. First, Nike's characterization of *Brinker* is incorrect. Nike states that *Brinker* "held that class certification is unwarranted where an employer has a formal off the clock policy to pay employees for all time worked." Def.'s Opp. at 4, ECF 53. But the obstacle to class certification in *Brinker* was that liability was "contingent on proof Brinker knew or should have known off-the-clock work was occurring," and "[n]othing before the trial court demonstrated how this could be shown through common proof, in the absence of evidence of a uniform policy or practice." *Brinker*, 53 Cal. 4th at 1051. In contrast, Nike has a uniform policy of requiring all employees to be inspected when they leave the store, even if this means employees have to wait for a manager, supervisor, or security guard to become available to do the inspection. *See* McPike Depo. at 50:2-11, 73:4-8, 82:7-21, Lee Decl. Ex. A, ECF 51-1. Employees are required to clock out before they go to the store exit to get checked and leave. *See id.* at 72:23-73:14. Because Nike has a uniform

9

policy of requiring employees to go through an exit inspection, and potentially wait for an exit inspection, while off the clock, the proof issue in *Brinker* is not an obstacle here.

Second, the employers in *Ortiz* and *Cornn* had policies in place to compensate employees for off the clock work, and in *In re AutoZone*, the plaintiffs did not present evidence that AutoZone did not provide a means for compensating employees for off the clock work. *See Ortiz*, 2013 WL 6236743, at *9; *Cornn*, 2005 WL 2072091, at *5; *In re AutoZone*, 289 F.R.D. 539. Nike does not have a policy in place to compensate employees for off the clock work, and Rodriguez has presented sworn declarations and deposition testimony from managers stating that they did not know of any policy compensating employees for exit inspection waiting time, which is off the clock.

### III. Employees Are Working During Time Spent in or Waiting for Bag Checks

Nike next argues that employees are not subject to its control when they are going through or waiting for an exit inspection. *See* Def.'s Opp. at 6-12, ECF 53. This is relevant because under California Industrial Welfare Commission Wage Order No. 4, "hours worked" are defined as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." In support of its argument, Nike makes three points: first, employees might or might not be "subject to the control of the employer" when they are in the store after clocking out, because some employees engage in personal activities inside the store after clocking out. Def.'s Opp. at 7-9, ECF 53. Second, employees make a personal decision to bring a bag and be subjected to a bag check. *See id.* at 9-11. Third, under *Frlekin v. Apple Inc.*, employees are not "suffered or permitted to work" while waiting for a bag check. Def.'s Opp. at 11-13, ECF 53 (citing Case No. C 13-03451 WHA, 2015 WL 6851424, at *1 (N.D. Cal. Nov. 7, 2015)). None of these arguments is successful.

First, Nike's argument that employees are not subject to the control of their employer when they are in the store after clocking out is addressed at a straw man. Nike submitted several employee declarations to show that many employees clock out of work and then linger in the store for personal reasons: some shop, some use the bathroom, some chat with coworkers, and some take an in-store exercise class. *See* Def.'s Opp. at 7-8. The fact that some employees are engaging

in personal activities, says Nike, means that whether employees are subject to the control of their employer after clocking out is an individualized inquiry. *See id.* But this is irrelevant: Rodriguez is not asking for compensation for all the time between when an employee clocks out and when she walks out the front door. He is asking for compensation only for time spent waiting for an exit inspection or being inspected. All employees have to be visually inspected before they can leave the store, and so no individualized inquiries are required. As Jenna Etherington, a Head Coach in Orange, stated, even when employees linger in the store after clocking out, they "still will need a bag check or visual inspection before leaving." Etherington Decl. ¶ 24, ECF 44-1.

Second, Nike's argument that employees make a personal decision to bring a bag and be subjected to a bag check is irrelevant to the issue of whether employees are subject to their employer's control while waiting for an exit inspection or being inspected. Nike argues that "**bag checks do not apply every time an employee exits the store and bag checks do not apply to employees who choose not to bring a bag**." Def.'s Opp. at 9, ECF 53 (emphasis original). Since employees make a decision to bring a bag, says Nike, none of them are subject to their employer's control. *See id.* at 10. This argument is true so far as it goes—but it does not go far. It is literally true that only employees who bring bags (or boxes or something similar) to work get their bags checked when they leave. But this characterization of Nike's employee exit procedures omits the fact that all employees must be visually inspected by a manager, supervisor, or contract security before they can leave the store, whether or not they have a bag. McPike, Nike's 30(b)(6) witness, testified that all store employees must be inspected before they can leave the store:

> Q. But I'm saying even for the employees who don't have anything on their hands, carrying a bag or anything, if they're just walking out with just a T-shirt and a pair of shorts, let's say, and their shoes, that employee is still subject to the bag inspection; correct?
>
> A. That employee is to be checked out by a manager per policy as they are exiting.
> . . .
>
> Q. But the employee is still required to go through the inspection process, whether it be a physical or visual process; correct?
>
> A. It is a – it is a meeting at the front door between the manager and the employee so that the manager can see that the employee doesn't have a bag, a box or anything like that, any unpaid for merchandise.

McPike Depo. at 94:24-95:24, Lee Decl. Ex. A, ECF 51-1. While only employees that have "a bag, a box, or anything like that" that must get their bag, box, or similar object checked, employees without "a bag, a box, or anything like that" still are visually inspected to verify that they do not need to have "a bag, box, or anything like that" checked and that they are not stealing merchandise. An employee subject to either type of inspection by the employer may still be subject to the employer's control.

Nike also argues that visual inspections are brief and take only a couple seconds when employees do not have bags; this does not address the issue of whether employees have to wait for the visual inspections and are compensated for such wait time, and more properly goes to whether the waiting time is de minimis, which is addressed below. *See infra* at 12-13.

Third, Nike's argument that employees might or might not be suffered or permitted to work while waiting for an exit inspection is inappropriate at this stage of the litigation. Nike argues that *Frlekin v. Apple Inc.* held that the time employees spend waiting for a bag check does not constitute an activity wherein an employee is "suffered or permitted to work." Def.'s Opp. at 11-12, ECF 53 (citing *Frlekin*, 2015 WL 6851424, at *11). That holding, however, was on summary judgment, rather than class certification. *See* 2015 WL 6851424, at 1. Moreover, the Court in *Frlekin* had previously granted class certification because there was a common question of whether time spent waiting in line for a bag check was compensable. *See Frlekin v. Apple Inc.*, 309 F.R.D. 518, 524 (N.D. Cal. 2015). Finally, Apple's policy differs from Nike's policy in one key respect: in *Frlekin*, it was "undisputed that some employees did not bring bags to work and thereby did not have to be searched when they left the store." 2015 WL 6851424, at *6. In this case, all employees must be inspected before they can leave the store, whether or not they have a bag. That may affect the question of whether time spent waiting to be inspected is an activity wherein an employee is suffered or permitted to work.

In sum, Nike's arguments that employees are not suffered or permitted to work when they have clocked out and are waiting for an exit inspection, and that this time is not compensable as work, are unpersuasive.

### IV. Whether Bag Checks are de Minimis Does Not Preclude Class Certification

Nike's last overarching argument is that exit inspections take only a small amount of time, which is de minimis, and that whether time is de minimis is an individualized liability inquiry as to each class member. *See* Def.'s Opp. at 12-15, ECF 53. The Ninth Circuit has approved a three-factor test in deciding whether time is de minimis under the FLSA, and the test considers

> (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work.

*Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir.1984). The same test applies to California wage claims. *See Gillings v. Time Warner Cable LLC*, 583 Fed. App'x 712, 713 (9th Cir. 2014); DLSE, February 3, 1994 Opinion Letter; DLSE Enforcement and Interpretations Manual 46.64, 47.2.1, 48.19. Whether the time is de minimis is a common issue. "That is, if the time is compensable at all, an across-the-board rule, such as sixty seconds, might wind up being the *de minimis* threshold. This issue as well will be litigated on a class-wide basis." *Frlekin*, 309 F.R.D. at 525.

### V. Class Certification: Rule 23(a)

Having considered Nike's thematic arguments, the Court now turns to whether Rodriguez has satisfied the requirements of Rule 23(a) and 23(b)(3). Class certification requires satisfying both Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements and at least one of the provisions of Rule 23(b). *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F. 3d 581, 588 (9th Cir. 2012). Rodriguez moves to certify his class under Rule 23(b)(3). *See* Pl.'s Mot. at 14-15, ECF 51. The Court first considers whether Rodriguez has satisfied Rule 23(a), and then turns to his arguments under Rule 23(b)(3).

Under Rule 23(a)'s threshold requirements, class certification is appropriate only if

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

13

Fed. R. Civ. P. 23(a). A fifth requirement, which is typically addressed before numerosity, is ascertainability. *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884 (N.D. Cal. 2015) Although Nike argues that ascertainability, numerosity, commonality, and adequacy are not satisfied, the Court finds that all of Rule 23(a)'s requirements are satisfied.

### A. Ascertainability and Numerosity

Before analyzing numerosity, district courts have required a showing that the class to be certified is ascertainable. *See Xavier v. Philip Morris USA, Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011). Ascertainability requires that the class definition be "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member" before trial, and by reference to "objective criteria." *Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115, 122 (N.D. Cal. 2014).

Nike argues that the proposed class is neither ascertainable nor numerous because some class members have been paid for at least some of the time they spent waiting to be inspected. *See* Def.'s Opp. at 15-16, ECF 53. As evidence, Nike relies on declarations from seven current or former managerial staff, and the 571 time adjustments. *See id.* This evidence, however, fails to support Nike's argument: none of the 571 time adjustments is noted in the records as being related to time spent waiting to be inspected. *See supra* at 5-6. A review of the declarations shows that only a small handful of employees received time adjustments for inspection waiting time from these managers: Aquino made "several" adjustments, Etherington made two or three, Greer's assistant store manager made one, Voigtlaender never made any, Hilger made one to two, Roos made a "handful," and Lanning made two to three. *See* Aquino Decl. ¶¶ 5-6, ECF 53-1; Etherington Decl. ¶ 23, ECF 44-1; Greer Decl. ¶ 7, ECF 53-1; Voigtlaender Decl. ¶ 18, ECF 44-1; Hilger Decl. ¶ 10, ECF 53-1; Roos Decl. ¶ 10, ECF 53-1; Lanning Decl. ¶ 7, ECF 53-1. Even if the identities of these employees are unknown, they represent at most a small fraction of the 6,242 or 9,175 class members and do not make the class impossible to ascertain.[1]

---

[1] In its notice of removal, Nike initially stated that it "employed approximately 6,242 non-exempt retail store employees in California" during the time period identified in the complaint. Notice of Removal ¶ 18, ECF 1. Later on, during the discovery process, Nike identified 9,175 putative class members. *See* Lee Decl. ¶ 5, ECF 51-1. Whether it is 6,242 putative class members or 9,175,

14

**B. Commonality**

"[C]ommonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (citations and internal quotation marks omitted). In other words, "the key inquiry is not whether the plaintiffs have raised common questions, 'even in droves,' but rather whether class treatment will 'generate common *answers* apt to drive the resolution of the litigation.'" *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Dukes*, 131 S. Ct. at 2551) (emphasis in original). However, not every question of law or fact must be common to the class; "all that Rule 23(a)(2) requires is a single *significant* question of law or fact." *Id.* (internal citations omitted) (emphasis in original).

Commonality is satisfied here because there is a common question of whether Nike's employees should be compensated for off the clock time spent undergoing the mandatory inspection. Nike argues that there are no common answers to this question because of Nike's bag check policy and waiting time policy. *See* Def.'s Opp. at 16-17, ECF 53; Def.'s Mot. at 8-10, ECF 44-5. The reference to the bag check policy is unclear; if it is a reference to Nike's earlier argument that not all employees have to get their bags checked, then it does not defeat commonality or require individualized inquiries because all employees had to be inspected before leaving the store, whether or not they had a bag. *See supra* at 1-2, 11-12. As for the waiting time policy, Nike did not have a uniform policy of paying for time spent waiting to be inspected. *See supra* at 7-10.

**C. Adequacy**

Adequacy requires the lead plaintiff to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy determination requires the Court to make two determinations: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) whether the named plaintiffs and their counsel will "prosecute

---

either figure is so numerous as to make joinder of all members impracticable.

the action vigorously on behalf of the class[.]'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citation omitted). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Id.* (citation omitted).

Nike argues that the proposed class includes both employees that were subject to inspection and managerial employees that conducted the inspections and were responsible for providing waiting time pay adjustments. *See* Def.'s Opp. at 17-18, ECF 53; Def.'s Mot. at 10, ECF 44-5. Nike argues that this creates a conflict of interest and Rodriguez cannot adequately represent the employees that were responsible for doing inspections or for making and approving time adjustments. *See id.* Nike does not identify any specific conflicts that would arise from Rodriguez's representation of non-exempt managerial employees. *See id.*

"There is no *per se* rule that the presence of supervisory and nonsupervisory employees in a proposed class creates a conflict of interest." *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 606 (C.D. Cal. 2015) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 958 (9th Cir. 2003)). "The question whether employees at different levels of the internal hierarchy have potentially conflicting interests is context-specific and depends upon the particular claims alleged in a case." *Staton*, 327 F.3d at 958. In *Moore*, the plaintiff alleged that all non-exempt employees were subject to the same exit inspection policy, and so "even though supervisors typically conducted the checks, the claim that the policy required or encouraged all non-exempt hourly employees to work without compensation suggest[ed] that both supervisors and their subordinates were affected similarly." *Moore*, 311 F.R.D. at 606. Rodriguez similarly alleges that all class members, managerial or not, were subject to the inspection policy. *See* First Amended Compl. ¶¶ 20, 23, ECF 27 ("FAC"). The policy was a uniform, company-wide policy, and the managers neither created the policy nor had discretion to deviate from it. *See* Pl.'s Opp. at 10, ECF 52. Rodriguez does not allege that employees at different levels of the management hierarchy were treated or affected differently. As a result, the presence of managerial employees in the class does not create a conflict or make Rodriguez an inadequate representative.

**D. Typicality**

Nike does not challenge typicality, but the Court nonetheless addresses it as a requirement of Rule 23(a). To satisfy Rule 23(a)'s typicality requirement, Rodriguez's claims must be typical of those advanced by the class. Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation and internal quotation marks omitted). Rodriguez's injury—that he was not paid for time spent waiting to be inspected—is the same as that of the class members, and it was caused by Nike's uniform inspection policy, which applied to all class members. All the requirements of Rule 23(a) are satisfied.

**VI. Class Certification: Rule 23(b)(3)**

The second half of the Rule 23 analysis requires plaintiffs to satisfy "through evidentiary proof at least one of the provisions of Rule 23(b)." *Mazza*, 666 F.3d at 588. Rodriguez moves to certify his class under Rule 23(b)(3), and so he must establish that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Nike argues that neither the predominance nor the superiority requirements are satisfied. *See* Def.'s Opp. at 18-24, ECF 53; Def.'s Mot. at 11-24, ECF 44-5. On predominance, Nike argues that individualized issues will predominate because Nike's policies provide for waiting time pay for time spent for exit inspections; because employees engage in personal activities between clocking out and the exit inspection; and because individualized issues will predominate about whether any particular employee was subjected to more than a de minimis amount of waiting time. *See* Def.'s Opp. at 18-23; Def.'s Mot. at 11-24, ECF 44-5. None of these arguments is persuasive: first, Nike does not have a uniform policy of paying for waiting time for inspections. *See supra* at 7-10. Second, whether employees engage in personal activities between clocking out and the exit inspection does not cause individualized issues to predominate, when all employees

must go through the exit inspection before they can leave. Nike cites *Cervantez v. Celestica Corp.* for the proposition that employees' ability to run in-store errands makes the exit inspection non-compensable. *See* Def.'s Opp. at 22, ECF 53 (citing *Cervantez*, 253 F.R.D. 562 (C.D. Cal. 2008). But *Cervantez* held that "[p]laintiffs are under the control of their employers while in the security line at the end of the shift: they cannot choose to leave the premises without going through the line, nor can they choose to run a personal errand before going through the line." 253 F.R.D. at 572. As in *Cervantez*, Nike employees cannot leave the premises without being inspected. While they may run a personal errand before being inspected, they can only run errands that can take place within the store, and they cannot leave the store to run an errand without being inspected. The Nike exit inspection thus is more akin to *Cervantez*'s exit inspection, for which a class was certified, than *Cervantez*'s pre-work inspection, for which a class was not. *See id.* at 571-72. Third, whether the time was de minimis is a common question that predominates over individualized inquiries. *See supra* at 13. Moreover, whether class members' waiting time was more than de minimis and creates liability may be addressed by using representative sampling. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045-49 (2016).

On superiority, Nike argues that Rodriguez cannot show that a class action is superior to other available methods for a fair and efficient adjudication, because Rodriguez has not explained how the off the clock violations can be tried to establish classwide liability. *See* Def.'s Opp. at 23-24; Def.'s Mot. at 24-25, ECF 44-5. A class action is superior, however, because there is a common question that would need to be answered in every case if these claims were brought individually, namely, whether off the clock time spent waiting for and undergoing exit inspections is compensable, and representative sampling may be used to resolve the liability question. Contrary to Nike's assertion, off the clock cases have been certified. *See* Def.'s Opp. at 24, ECF 53; *see, e.g., Frlekin v. Apple Inc.*, 309 F.R.D. 518 (N.D. Cal. 2015); *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 593 (C.D. Cal. 2015); *Cervantez v. Celestica Corp.*, 253 F.R.D. 562 (C.D. Cal. 2008); *Kurihara v. Best Buy Co.*, Case No. C 06-01884 MHP, 2007 WL 2501698, at *1 (N.D. Cal. Aug. 30, 2007).

18

## VII. ORDER

"An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B). The Court thus certifies the class of

> All current and former non-exempt retail store employees of Defendant who worked in California during the period from February 25, 2010 to the present.

The Court certifies the causes of action alleged in Rodriguez's First Amended Complaint as appropriate for class treatment. The Court certifies Rodriguez as class representative and his counsel of record as class counsel. Rodriguez's motion is GRANTED. Nike's motion is DENIED as moot.

**IT IS SO ORDERED.**

Dated: August 19, 2016

_____
BETH LABSON FREEMAN
United States District Judge