# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

ISAAC RODRIGUEZ,

        Plaintiff,

    v.

NIKE RETAIL SERVICES, INC.,

        Defendant.

Case No.  14-cv-01508-BLF

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

[Re:  ECF 84]

The all too familiar bag check we experience in airports, ballparks, and federal courthouses is also firmly ensconced in the workplace.  Employers, seeking to reduce employee theft, require exiting staff to open their bags and pockets for inspection.  The question in this case is whether that time in compensable.  Defendant Nike Retail Services, Inc. ("Nike") seeks summary judgment under the *de minimis* doctrine, arguing that its time and motion study shows an average inspection takes no more than 18.5 seconds which it claims is *de minimis* as a matter of law and thus not compensable.  Plaintiffs refute this evidence, claiming wait times can take up to a few minutes, which is compensable.  Plaintiffs further argue that capturing the time is feasible and Nike has failed to meet its burden of demonstrating entitlement to judgment.

On August 10, 2017, the Court held a hearing on Nike's motion for summary judgment and the matter was taken under submission.  For the reasons that follow, Nike's motion for summary judgment against the certified class is GRANTED.

## I. BACKGROUND

In order to resolve the instant motion, the Court must consider evidence of how Nike conducts its mandatory exit inspections, and how long those inspections take.  Although the general nature of the exit inspections is not in dispute, the parties present conflicting evidence as to the length of time employees spend waiting for an exit inspection and undergoing an exit inspection.

## A.        Undisputed Facts and Procedural Posture

As set forth in detail in the Court's August 19, 2016 Order Granting Plaintiff's Motion for Class Certification, Nike's non-exempt retail store employees in California are required to punch in and out of work on a time clock to track their hours, and they are paid accordingly.  ECF 69. Out of concern for theft of merchandise and a desire to keep managers apprised of who is in the store, Nike further requires its employees to undergo mandatory exit inspections whenever they leave the store.  Because employees must clock out of work before they exit the store, whether during a rest break or when they depart for the day, the exit inspections at issue occur "off the clock."  All Nike employees are subject to exit inspections regardless of whether they are carrying a bag.  However, Nike's exit inspections take a variety of forms, and the time it takes depends on whether the employee is carrying a bag or if authorized personnel are immediately available to conduct the inspection.

If the employee is not carrying a bag, box, or something similar, the employee is subject only to a "visual inspection."  If the employee is wearing a jacket, a visual inspection may involve a request to unzip the jacket.  An employee carrying a bag, box, or something similar is subject to a "bag check" whereby the employee must open the bag to show its contents before exiting. Because exit inspections can only be conducted by managers, supervisors, or contract security, an employee trying to leave the store after clocking out may have to wait at the exit until someone with the requisite authority is available to conduct the inspection.[1]

Plaintiff Isaac Rodriguez ("Rodriguez") was a non-exempt employee at Nike's Gilroy, California retail store for two months from November 11, 2011 to January 11, 2012. ECF 69, 6:17-18.  On behalf of himself and a certified class of similarly situated Nike retail store employees in California, Rodriguez alleges that Nike failed to compensate class members for time spent in connection with the above-described exit inspections that occurred after employees clocked out. First Amended Complaint ("FAC") ¶ 23, ECF 27.  Rodriguez brings claims on behalf of himself and the certified class against Nike for (1) failure to pay minimum wages in violation of

---

[1] The time it takes for an employee to walk from the time clock to the exit of the store is not at issue in this lawsuit. *See* Class Certification Hearing Transcript 6:7-20, ECF 67.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Cal. Labor Code §§ 1194, 1197; (2) failure to pay overtime wages in violation of Cal. Labor Code

2  §§510, 1194; and (3) unfair and unlawful business practices in violation of Cal. Bus. Prof. Code

3  §§ 17200, et seq. *See generally*, FAC.

4  On August 19, 2016, the Court certified a class pursuant to Federal Rule of Civil Procedure

5  23 consisting of "[a]ll current and former non-exempt retail store employees of Defendant who

6  worked in California during the period from February 25, 2010 to the present."[2]  In its order

7  certifying the class, the Court held that whether time spent undergoing exit inspections is *de*

8  *minimis* is a common issue.  "That is, if the time is compensable at all, an across-the-board rule,

9  such as sixty seconds, might wind up being the *de minimis* threshold.  This issue as well will be

10  litigated on a class-wide basis." ECF 69, 13:11-14 (citing *Frlekin v. Apple Inc*., 309 F.R.D. 518,

11  525 (N.D. Cal. 2015)).

12  On January 31, 2017, Nike moved for summary judgment against the certified class on the

13  ground that any time spent in connection with exit inspections is *de minimis* and therefore not

14  compensable as a matter of law. ECF 84 ("Mot.").  In order to measure the time spent by

15  employees in connection with exit inspections, Nike retained expert Robert W. Crandall, M.B.A.

16  ("Crandall"), and Resolution Economics LLC to conduct a scientific sampling in the form of a

17  "time and motion study" (hereafter, the "Crandall Study"). Mot. 6.  "For purposes of measuring

18  the amount of time it takes workers or groups of workers to perform certain tasks, a properly-

19  conducted time and motion study is the methodology that provides the most accurate and reliable

20  analysis." Crandall Decl. ¶ 9, ECF 84-3.  Data collected in the course of a time and motion study

21  is recorded by video observations and in-person observations, which can be directly validated by

22  an opposing party. Mot. 7.  Nike provided the certified class, their counsel, and their designated

23  expert with full access to all of the data collected. *Id*.

24  Rodriguez opposes Nike's motion, but does not offer evidence from his own study or a

25  survey of the members of the certified class. *See* Plaintiff's Opposition ("Opp'n"), ECF 92.

26  Rather, Rodriguez retained expert Brian Kriegler, Ph.D. ("Dr. Kriegler") of Econ One Research,

27

28  [2] In so doing, the Court granted Rodriguez's motion to certify the class and denied Nike's motion to deny class certification as moot.

United States District Court
Northern District of California

1    Inc. to evaluate and critique the Crandall Study. *Id*. 2.  Rodriguez argues that the Crandall Study is

2    "flawed and unreliable" for a number of reasons detailed in Rodriguez's opposition and the

3    Kriegler Declaration, ECF 92-2.  Opp'n 1.  Specifically, Rodriguez relies on Dr. Kriegler's

4    testimony to challenge the reliability of the Crandall Study on six grounds: (1) the study was too

5    narrow in terms of scope and time to be applied to the entire class period; (2) the study required

6    observers to make constant "judgment calls" about what they were watching; (3) the study

7    artificially decreased reported times by assuming that when an employee was talking or interacting

8    with another person, the employee was not also waiting for a security check; (4) the study's data

9    collection is flawed because the in-person observations yield significantly different results from

10   the video observations; (5) the video observations are flawed because they are based on the

11   assumption that managers only conducted the exit inspection on camera; and (6) the in-person

12   observations performed inconsistently when compared with each other. Opp'n 2-12.

13          Rodriguez also points to the deposition testimony of Nike retail store managers to

14   contradict the results of the Crandall Study. Opp'n 2.  He argues this testimony further

15   demonstrates that the Crandall Study is unreliable. *Id*.  Although the Court had invited the parties

16   to retain a joint expert to conduct a time and motion study to which the Court could consider the

17   *de minimis* standard, clearly that suggestion was not seen by the parties as the best way to proceed.

18   Thus, Nike contends that its statistical evidence provides "undisputed conclusions regarding the

19   average and median lengths of time spent in connection with exit inspections." Mot. 6 n.4.  Nike

20   argues that to the extent Rodriguez disputes the evidence in the Crandall Study to create a genuine

21   issue of material fact, such a dispute necessarily requires decertification of the class due to

22   individualized inquiries and trial manageability concerns. *Id*.

23          Resolution of the instant motion for summary judgment turns on whether there are material

24   disputed facts in the record on the *de minimis* doctrine and whether the *de minimis* rule is

25   recognized under California law.  Therefore, the Court must consider whether the respective

26   evidence presented by Nike and Rodriguez regarding the time spent by employees undergoing exit

27   inspections presents any triable issue of fact.  Below, the Court summarizes the results of Nike's

28   Crandall Study as well as the deposition testimony of the Nike store managers, and will address

additional facts as required in the discussion.

**B.      Results of the Crandall Study**

The results of the Crandall Study are based on a random sampling of 15 out of the 34 Nike retail stores in California. Crandall Decl. ¶¶ 26-34.  This sample represents 44% of the Nike stores in California. *Id.* ¶ 32.  The 15 stores selected for the study were then further randomly assigned to an "observation approach" of either a video or in-person observation. *Id.* ¶ 35.  10 Nike retail stores were randomly selected for video observation and 5 were randomly selected for in-person observation. *Id.* ¶¶ 35-36.  In total, the Crandall Study analyzed 1,662 exits over a period of two full days at 15 store locations in late 2016. *Id.* ¶ 55.  862 Nike retail store employees were scheduled to work across the stores on those days. *Id.* ¶¶ 55, 59.[3]  Using statistical analysis, Crandall extrapolated the data to the entire class of approximately 10,000 current and former Nike retail store employees.  *Id.* ¶¶ 14-20.

**1.      Waiting Time**

The Crandall Study defined waiting time as the time between when the employee reaches the door area of the store and the time a visual inspection or bag check is initiated. *Id.* ¶ 62.  Waiting time occurs when employees have to wait for an authorized person to conduct an exit inspection or for other employees to be checked. *Id.*

The study reveals that 60.5% of all exits recorded had zero waiting time.  *Id.* ¶ 63.  Thus, the remaining 39.5% of exit inspections had some amount of waiting time. *Id.* ¶ 64.  Of the exit inspections that had any waiting time, 83.38% of waiting times were one minute or less. *Id.* ¶ 67.  The average waiting time of all exit inspections observed was 14.2 seconds. *Id.* ¶ 69.  The average waiting time that can be extrapolated to the entire class is 12.6 second to 15.8 seconds at a 95% confidence level. *Id.* ¶ 72.[4]

---

[3] Although 862 employees were scheduled to work at the 15 stores during the two-day period observed by the Crandall Study, there were 1,662 recorded exits.  An employee can have multiple store exits including during rest periods, meal periods, at the end of a shift, and at the time the store closed. Mot. 8 n.7.

[4] For the exits where waiting time occurred at all, the average was 36 seconds. Extrapolated to the entire class, the average wait time was between 32.6 seconds and 30.5 seconds.  *Id.* ¶ 74-76.

United States District Court
Northern District of California

### 2.    Visual Inspections

51% of the 1,662 exit inspections observed had a visual inspection rather than a bag check. *Id*. ¶ 78.  Of those exits where a visual inspection occurred, 99% lasted less than 23 seconds. *Id*. ¶ 87.  The average visual inspection lasted 3.1 seconds. *Id*. ¶ 88.  Extrapolated to the entire class, the average visual inspection time was 2.7 seconds to 3.5 seconds at a 95% confidence level.  *Id*. ¶ 90.

### 3.    Bag Checks

The Crandall Study recorded 756 bag checks out of the 1,662 exit inspections (45.5%). *Id*. ¶ 92.  Of the exits where a bag check occurred, 99.6% had a duration of less than one minute.  *Id*. ¶ 98.  The average length of a bag check was 7.5 seconds. *Id*. ¶ 99.  Extrapolated to the class, the average bag check duration was between 6.8 seconds and 8.2 seconds at a 95% confidence level. *Id*. ¶ 101.

### 4.    Combined Exit Inspection Time

The Crandall Study calculated the combined total time of the exit inspection process, assuming an employee experienced waiting time following by either a visual inspection or a bag check. *Id*. ¶¶ 103-111.  21.5% of combined exit inspections involved no time at all. *Id*. ¶ 103.  This is explained by the fact that the majority of exits did not involve any waiting time or a bag check, and only involved a visual inspection as the employee departed the store "without breaking his or her stride." Mot. 12.  97.5% of the exits had a combined exit inspection time of less than two minutes. Crandall Decl. ¶ 107.  Collectively, the average combined time of an exit inspection was 18.5 seconds. *Id*. ¶ 108.  Extrapolated to the entire class, the average combined time was between 16.9 seconds and 20.2 seconds per exit. *Id*. ¶ 110.

### C.    Deposition Testimony of Nike Store Managers

In its opposition and at the hearing on the instant motion, Rodriguez points to evidence from the deposition testimony of Nike retail store managers in California regarding the amount of time that the exit inspections took.  In particular, Brian Aquino, Megan Roos, and Michael Ruybal testified as to the length of time of each component of the exit inspections.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 1.     Waiting Time

Brian Aquino, Nike Assistant Head Coach in the Petaluma store, testified that at the Petaluma location, 90% of the time an employee was required to wait for some period of time for a manager to be available to perform the exit inspection. *See* Decl. of Larry W. Lee, ECF 92-1 ("Lee Decl.") Ex. E ("Aquino Depo.") 53:18-22.  He further testified that 60-65% of the time that period of waiting time was "at least a minute." Aquino Depo. 52:9-24.  Mr. Aquino further testified that when he worked at the Nike retail store in Gilroy, California, employees were required to wait even longer periods of time.  Aquino Depo. 68:9-13.

Megan Roos, Nike Assistant Head Coach at the Vacaville store since April 2012, testified that 40-50% of the time that she performed checks at the Vacaville location, the employee had to wait at least one full minute before the check was performed. Lee Decl. Ex. F ("Roos Depo.") 89:2-4, 91:21-92:20.  Michael Ruybal, Assistant Head Coach at the Nike store in San Francisco since 2011, testified that at the San Francisco retail store, if an employee had to wait for a manager to conduct the inspection, most of the time that waiting period was between two and five minutes. Lee Decl. Ex. G ("Ruybal Depo.") 39:13-17.

### 2.     Visual Inspections

According to Mr. Aquino, a visual inspection of an employee wearing a jacket would take 30 seconds to a minute. Aquino Depo. 46:17-22.  Rodriguez offers no evidence from the testimony of store managers regarding the length of a visual inspection when the employee is not wearing a jacket.  Nike offers evidence that Rodriguez, who was an employee not a manager, testified in his own deposition that a visual inspection of the employee would take "roughly" less than two seconds. Rodriguez Depo. 27:7-11.

### 3.     Bag Checks

Mr. Aquino testified that a bag check would take "about a minute." Aquino Depo. 46:17-22. Rodriguez cites no other evidence from the store managers regarding the length of bag checks.

### 4.     Combined Exit Inspection Time

Rodriguez does not identify or rely on any testimony by the Nike's store managers regarding the combined time of the exit inspection process.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.   "A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id*. at 248–49.

The moving party "bears the burden of showing there is no material factual dispute," *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).  In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial."  *House v. Bell,* 547 U.S. 518, 559-60 (2006).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses.  *Nissan Fire*, 210 F.3d at 1103.  If the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. 317, 323 (1986).  "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor."  *City of Pomona*, 750 F.3d at 1049.  However, "the 'mere existence of a

United States District Court
Northern District of California

United States District Court
Northern District of California

1  scintilla of evidence in support of the plaintiff's position'" is insufficient to defeat a motion for

2  summary judgment. *Id.* (quoting *Anderson*, 477 U.S. 242, 252 (1986)).  If the nonmoving party's

3  "evidence is merely colorable, or is not significantly probative, summary judgment may be

4  granted." *Liberty Lobby*, 477 U.S.at 249-50 (internal citations omitted).   "'Where the record

5  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

6  genuine issue for trial.'"  *City of Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita Elec. Indus.*

7  *Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

8  ### III.   DISCUSSION

9  Nike seeks summary judgment against the certified class on the basis that the amount of

10  unpaid time spent by its employees undergoing exit inspections is *de minimis* and therefore not

11  compensable as a matter of law. *See generally* Mot.  Nike bears the burden of proving the

12  applicability of the *de minimis* doctrine at trial. *See Gillings v. Time Warner Cable LLC*, 583 Fed.

13  App'x 712, 714 (9th Cir. 2014) (unpublished) (citing *Rutti v. Lojack Corp.*, 596 F.3d 1046, 1057

14  n.10 (9th Cir. 2010)).  As the moving party on summary judgment, Nike must come forward with

15  evidence that demonstrates an absence of any genuine issue of material fact on the *de minimis*

16  doctrine.  If Nike meets its initial burden, Rodriguez must produce evidence demonstrating a

17  triable issue of material fact on the *de minimis* doctrine such that a reasonable trier of fact could

18  find for Rodriguez and the certified class.

19  For the reasons that follow, the Court finds that it is appropriate to apply the *de minimis*

20  doctrine to California Labor Code claims given the current state of the law.  In determining

21  whether the parties have met their respective burdens on summary judgment, the Court considers

22  the findings in the Crandall Study as well as the deposition testimony of Nike employees as

23  evidence.  However, the Court does not consider the report of Rodriguez's rebuttal expert

24  Dr. Kriegler to the extent the Kriegler Report attacks the credibility of Nike's expert but does not

25  offer evidence on the *de minimis* doctrine for the Court to consider.  Ultimately, the Court

26  determines that the *de minimis* doctrine applies to the claims at issue in this case such that Nike is

27  entitled to summary judgment against the certified class.

28

### A.        The Applicability of the *De Minimis* Doctrine to Rodriguez's Claims

At the outset, the parties dispute whether the *de minimis* doctrine applies to claims for violations of the California Labor Code. Mot. 13; Opp'n 14.  The outcome of Nike's motion for summary judgment hinges on this question.  Therefore, the Court must first determine whether the doctrine applies to the claims in this case in light of existing precedent.  The *de minimis* doctrine arose in the context of the Federal Fair Labor Standards Act ("FLSA") to shield employers from having to pay for trivial amounts of time worked off-the-clock by employees that would otherwise be compensable. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946).  The Supreme Court of the United States held that "[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." *Id.*

In order to determine if the amount at issue is *de minimis*, the Ninth Circuit has instructed courts to consider three factors: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *See Lindow v. United States*, 738 F.2d 1057 (9th Cir. 1984).  The Ninth Circuit has held that *de minimis* is appropriately characterized as a "doctrine" or "rule" rather than an affirmative defense that must be pled by a defendant. *Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1080 (9th Cir. 2016).

As of the writing of this Order, the California Supreme Court has not addressed whether the *de minimis* doctrine applies to claims for unpaid wages under the California Labor Code. However, the Ninth Circuit and California's intermediate courts of appeal have done so, and have held that the *de minimis* doctrine applies to claims arising under California law. *See, e.g.*, *Gillings v. Time Warner Cable LLC*, 583 Fed. Appx. 712, 714 (9th Cir. 2014) (unpublished); *Corbin*, 821 F.3d at 1081 n.11; *Gomez v. Lincare, Inc.*, 173 Cal.App.4th 508, 527 (2009); *Chavez v. Angelica Corp.*, No. D063199, 2014 WL 6973497, at *1 (Cal. Ct. App. Dec. 10, 2014); *Mosley v. St. Supery Vineyards & Winery*, No. A137373, 2014 WL 793130, at *8 n.5 (Cal. Ct. App. Feb. 27, 2014)

(unpublished); *LoJack Corp. v. Superior Court*, No. B219647, 2010 WL 1137044, at *8 (Cal. Ct. App. Mar. 26, 2010) (unpublished).  One California court of appeal has declined to determine whether the *de minimis* rule applies to California wage and hour cases. *See Bustamante v. Teamone Employment Specialists, LLC*, No. B222136, 2011 WL 1844628, at *10 (Cal. Ct. App. May 17, 2011), *as modified on denial of reh'g* (June 6, 2011) (unpublished) (declining to consider whether *de minimis* applies under California law because "even if it does apply, disputed issues of fact preclude summary judgment in this case.")  However, the Court is not aware of any decision at the appellate level, and Rodriguez does not point to any, holding that the *de minimis* doctrine *does not* apply to claims brought under the California Labor Code. *Accord Gillings*, 583 Fed. App'x at 714 ("We have found no Court of Appeal case refusing to apply the *de minimis* standard to a wage claim under California law.")

The silence from California's highest court on the applicability of the *de minimis* doctrine to California Labor Code claims may soon be broken.  The California Supreme Court has agreed to review the issue at the Ninth Circuit's request. *See Troester v. Starbucks Corp.*, Case No. S234969; *Troester v. Starbucks Corp.*, 680 Fed. App'x. 511, 512 (9th Cir. 2016).  The Ninth Circuit certified the following question to the California Supreme Court:

> Does the federal Fair Labor Standards Act's *de minimis* doctrine, as stated in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) and *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984), apply to claims for unpaid wages under the California Labor Code sections 510, 1194, and 1197?

*Id*. Although briefing in *Troester* is complete, the matter remains pending before the California Supreme Court.  Therefore, this Court does not have the benefit of a ruling from California's high court that either alters or solidifies the viability of the *de minimis* doctrine outside of the FLSA context from which it originated.  In deciding the instant motion for summary judgment, this Court must operate in the present legal landscape and apply the law as it currently exists.  Under current law, the *de minimis* doctrine is a valid defense to wage claims brought under the California Labor Code. *See Hubbs v. Big Lots Stores, Inc*., 2017 WL 2304751 at *8 (C.D. Cal. May 12, 2017) ("Notwithstanding that there may be further development of the law in this area, there are

11

United States District Court
Northern District of California

1    substantial similarities between the FLSA and the requirements of the California Labor Code.  In

2    light of these similarities, the existing Ninth Circuit decisions are sufficient to permit the [*de*

3    *minimis*] analysis in this case.")

4       Here, Rodriguez argues that the *de minimis* doctrine is "archaic" and "should have no place

5    in modern times where time can be captured to the second." Opp'n 14.  Rodriguez further argues

6    that *de minimis* is solely a federal doctrine that has no applicability to the California Labor Code

7    which "was enacted to afford additional protections to employees beyond the FLSA." *Id*.

8    Rodriguez is not the first plaintiff to advance such arguments.  In fact, courts applying the *de*

9    *minimis* doctrine to wage claims under California law routinely consider and reject these

10   arguments. *See, e.g.*, *Gillings*, 583 Fed. App'x. at 713 ("The employees argue that the *de minimis*

11   doctrine does not apply to claims of unpaid wages under California's Labor Code. Not so.");

12   *Cervantez v. Celestica Corp.*, 618 F. Supp. 2d 1208, 1217 (C.D. Cal. 2009) (applying the *Lindow*

13   test to California Labor Code claims and rejecting plaintiffs' argument that "the *de*

14   *minimis* defense is an outdated principle and relates only to the FLSA, not California law.")

15   Although these policy arguments are currently before the California Supreme Court in *Troester*,

16   this Court declines Rodriguez's invitation to predict how the California Supreme Court will rule.

17   Rodriguez's argument that California labor law is more "employee friendly" than its federal

18   counterpart thus does not alter the Court's obligation to apply existing law and consider the

19   applicability of the *de minimis* doctrine to the claims in this case.[5]

20      When it certified the question in *Troester*, the Ninth Circuit made clear that two of its

21   panels had previously applied the *de minimis* doctrine to California wage claims in the absence of

22   a determination on the issue by the California Supreme Court. 680 Fed. App'x at 513.  In *Gillings*,

23

---

24   [5] None of the cases relied on by Rodriguez holds that employers must compensate employees for
25   trivial amounts of time. Opp'n 14-16 (citing *Augustus v. ABM Sec. Servs. Inc.*, 2 Cal. 5th 257, 262
     (2016); *Bernstein v. Virgin Am., Inc.*, No. 15-CV-02277, 2017 WL 57307, at *11 (N.D. Cal. Jan.
26   5, 2017); *See's Candy Shops, Inc. v. Superior Court*, 210 Cal. App. 4th 889 (2012)).  Rather, these
     cases only serve to demonstrate the protective nature of the California Labor Code that ultimately
27   led the Ninth Circuit to seek input from the California Supreme Court in *Troester* as to whether
     the *de minimis* test applies to California wage claims.  Until a decision comes down from the
28   California Supreme Court, this Court is bound by Ninth Circuit precedent on the *de minimis*
     doctrine and will not speculate as to the ultimate outcome.

United States District Court
Northern District of California

1    an unpublished disposition, the Ninth Circuit determined that because the California Supreme

2    Court has never ruled on the applicability of the *de minimis* doctrine to California wage claims, the

3    Ninth Circuit must follow the decisions of California's intermediate appellate courts absent

4    "convincing evidence that the state supreme court would decide the issue differently." 583 Fed.

5    App'x at 714 (quoting *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir.

6    2001)).  The *Gillings* court then summarized the state of the law among California courts of appeal

7    and considered the endorsement of the *de minimis* standard by the California Division of Labor

8    Standards Enforcement ("DLSE") which has persuasive value among California courts. 583 Fed.

9    App'x at 714.  The Ninth Circuit ultimately concluded that it must follow the existing law and

10   apply the *de minimis* doctrine to the employees' claims given the absence of "convincing

11   evidence" that the California Supreme Court would come out differently. *Id*.  As recently as 2016,

12   another panel of the Ninth Circuit followed the reasoning in *Gillings* and applied the *de minimis*

13   doctrine to California Labor Code claims. *Corbin*, 821 F.3d at 1081 n.11.  Again, the Ninth Circuit

14   found the adoption of the *de minimis* doctrine by California appellate courts and the DLSE to be

15   persuasive in the absence of direct guidance from the California Supreme Court. *Id*.  Despite these

16   decisions, the Ninth Circuit recognized the need for a clear determination on the issue by the

17   California Supreme Court. *Troester*, 680 Fed. App'x at 515.

18         Finally, it is worth noting that nearly one year ago this Court had the opportunity to stay

19   Nike's summary judgment motion on the *de minimis* doctrine pending a decision in *Troester* and

20   declined to do so. *See* ECF 78, 5:20-7:5.  The parties then proceeded to conduct discovery on the

21   defense and brief the instant motion.  Nike also points out that this Court has already held in its

22   order granting class certification in this case that the *de minimis* doctrine applies to Rodriguez's

23   California Labor Code claims. Mot. 15; ECF 69, 13:8-9 ("The same [*de minimis*] test applies to

24   California wage claims.")  For these reasons, the Court finds that the *de minimis* doctrine applies

25

26

27

28

United States District Court
Northern District of California

to Rodriguez's wage claims brought pursuant to the California Labor Code.[6]

## B.   Evidence on Summary Judgment

### 1.   The Kriegler Report

Before turning to the required analysis under the *Lindow* factors, the Court addresses the nature of the evidence before it.  In support of its motion for summary judgment, Nike offers findings from its time and motion study detailed in the Crandall Declaration. ECF 84-3.  Rodriguez does not present the Court with evidence from a competing study.  Rather, Rodriguez retained an expert to attack the credibility of the Crandall Study.  Rodriguez dedicates most of his opposition to picking apart the findings and methodology of the Crandall Study through Dr. Kriegler.  Ultimately, Rodriguez argues that the Crandall Study is so fatally flawed that Nike cannot satisfy its burden on summary judgment. *See* Opp'n 17.

The Court does not consider the portions of Dr. Kriegler's expert report attacking the credibility of the Crandall Study at summary judgment because those portions of the Kriegler Report do not supply evidence addressing any of the *de minimis* factors.  Rodriguez cited to no authority in his opposition or at the hearing on the motion for summary judgment to support his position that summary judgment must be denied when an expert attacks the credibility of the other side's expert report.  Such a situation may be appropriate on a motion to strike expert testimony, but it is not evidence that creates a factual dispute for purposes of summary judgment.  In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial."  *House v. Bell,* 547 U.S. 518, 559-60 (2006).

To the extent Rodriguez offers the Kriegler Report as support for a motion to strike the Crandall Study, the motion is denied pursuant to Federal Rule of Civil Procedure 702 and *Daubert*

---

[6] Rodriguez argues that even if the *de minimis* doctrine applies at all, "[t]he *de minimis* rulings in FLSA cases provide no guidance as to how the *de minimis* theory operates under California law." Opp'n 18-20.  Although cloaked differently, this is the same point that Rodriguez makes in his argument that *de minimis* should not apply to this case at all.  Courts that have applied the *de minimis* doctrine to the California Labor Code explicitly apply the standard articulated in *Anderson*, *Lindow*, and other precedent from the FLSA context.  Rodriguez himself relies on precedent from FLSA cases in his opposition.  Thus, the Court rejects his argument that if it finds the *de minimis* doctrine applies, it cannot consider case law from the FLSA context.

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id*. at 589. These standards apply not only at trial, but also when a challenge to expert opinion is brought in the context of class certification or summary judgment. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (district court correctly applied *Daubert* standard to a motion to strike an expert opinion submitted in support of class certification); *In re Ford Tailgate Litig.*, No. 11-CV-02953-RS, 2015 WL 7571772, at *5 n.3 (N.D. Cal. Nov. 25, 2015) ("*Daubert* dictates the analysis necessary for a motion to exclude expert testimony in the context of a motion for summary judgment."); *Tietsworth v. Sears, Roebuck & Co.*, No. 5:09-CV-00288-JF, 2012 WL 1595112, at *7 (N.D. Cal. May 4, 2012) (applying *Daubert* standard to expert testimony at class certification stage). Here, Dr. Kriegler's opinions, while thorough, go to the credibility of Crandall's findings and not to admissibility. Crandall is well-qualified in the field of statistical analysis and has substantial experience in conducting time and motion studies to generate data from which he can base his conclusions. Although Dr. Kriegler's testimony could be persuasive to a jury at trial, Rodriguez has not shown that the Crandall Study is so "unreliable" as to necessitate exclusion under Rule 702.

Despite how Rodriguez characterizes the Kriegler Report, there is no "battle of experts" in this case. In support of this argument, Rodriguez compares the Crandall and Kriegler reports to the evidence before this Court in *Estate of Naharro v. Cty. of Santa Clara*, No. 14-CV-04570-BLF, 2016 WL 6248957 (N.D. Cal. Oct. 26, 2016). There, this Court considered the expert evidence presented by both sides in connection with the defendants' motion for summary judgment in a civil rights action brought pursuant to 42 U.S.C. § 1983. *Id*. The defendants submitted the declaration of an expert on police practices who testified that the officer's use of deadly force was consistent with police standards and state law. *Id*. at *12. This Court found that such evidence was sufficient to satisfy the defendants' initial burden on summary judgment. *Id*. The burden then shifted to the plaintiffs to produce evidence supporting their claims or defenses. *Nissan Fire*, 210 F.3d at 1103. The plaintiffs rebutted the defendants' evidence with their own

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1   police procedures expert who *presented evidence* that was directly in conflict with the opinion of

2   the defendants' expert and created disputed facts as to essential elements of the 1983 claim. *Estate*

3   *of Naharro*, 2016 WL 6248957, at *12.  The plaintiffs' expert did not simply point out "flaws" in

4   the methodology of the defendants' expert.

5          The situation in this case is not analogous to the "classic battle of experts" in *Estate of*

6   *Naharro* where both experts presented conflicting evidence on essential elements of the claim at

7   issue.  Dr. Kriegler does not present any evidence on the *de minimis* doctrine that could create a

8   genuine issue of material fact as to the length of the exit inspections.  Rather, he uses his expertise

9   to "expos[e] the flaws" of the evidence offered by Nike. Opp'n 17.  Rodriguez's attempt to equate

10  this situation to a battle of experts sufficient to deny summary judgment is misguided.  If this

11  strategy is to be accepted, then all a party needs to do to defeat summary judgment is to hire an

12  expert to point out flaws in the other side's evidence, without offering any conflicting evidence for

13  the jury to consider at trial on the relevant claim or defense.  Once the moving party has met its

14  initial burden, if the nonmoving party does not produce evidence to show a genuine issue of

15  material fact, the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. 317, 323

16  (1986).[7]

17         Rodriguez relies on two other cases to urge the Court to deny summary judgment on the

18  basis of the Kriegler Report alone.  These cases are similarly distinguishable.  In *Goldman v.*

19  *Standard Ins. Co.*, each side presented conflicting evidence on the essential elements of a defense.

20  341 F.3d 1023, 1035 (9th Cir. 2003).  The Ninth Circuit held that the plaintiff presented sufficient

21  evidence to create triable issues of fact on both prongs of the "reasonableness" standard of section

22  10144 of the California Insurance Code. *Id.*  The plaintiff's expert presented evidence on the

23  defendant's insurance policies that created a triable issue on the first prong of the defense.  The

24  plaintiff also presented evidence from two experts to refute the second prong of the defense on the

25  basis of medical data, actuarial principles and actual experience. *Id.*  These expert opinions

26  

27  _____
    [7] The Court recognizes that Rodriguez offers the Kriegler Report to argue that Nike cannot meet
    its initial burden on the *de minimis* doctrine, not just that it creates a triable issue of fact once the

28  burden shifts to Rodriguez.  Still, Rodriguez does not cite to any case law establishing that an
    expert's critique can prevent a moving party from meeting its burden of production.

1    presented evidence that contradicted the defendant's claims and raised questions of fact that

2    precluded summary judgment on the defense. *Id.* In *Goldman*, a reasonable fact-finder could

3    believe one expert over the other to determine if the defendant's denial of insurance coverage was

4    reasonable as a matter of law. *Id.* Here, the Kriegler Report does not raise a triable issue as to

5    whether time spent on exit inspections is *de minimis*.

6         Finally, in *Faron v. St. Joseph Hosp.*, the defendant presented an expert declaration in

7    support of his motion for summary judgment in a medical malpractice action. No. C 07-05602

8    SBA, 2008 WL 4820796 (N.D. Cal. Nov. 4, 2008). The defendant's expert presented evidence to

9    negate the elements of breach and causation. *Id.* at *5-6. The court held that the burden then

10   shifted to the plaintiff to present evidence affirming the elements in order to survive the motion.

11   *Id.* The plaintiff attached an expert declaration to his opposition with evidence that the defendant

12   had not met the requisite standard of care and had caused the plaintiff's injuries. *Id.* The court

13   concluded that this "battle of experts" on the issues of breach and causation created a genuine

14   issue of material fact that barred summary judgment. *Id.* Again, the Kriegler Report does not

15   present evidence that conflicts with or rebuts Nike's evidence as to the length of the exit

16   inspections, it merely attacks it as unreliable.

17        For these reasons, the Court does not consider the Kriegler Report's attack on the

18   credibility of the Crandall Report in its summary judgment analysis.[8]

19                    **2.    Deposition Testimony**

20        In contrast to the Kriegler Report, the deposition testimony of Nike's retail store managers

21   that Rodriguez relies on in his opposition constitutes evidence that the exit inspections took longer

22   than the Crandall Study suggests. The deposition testimony is therefore in conflict with the

23   findings of the Crandall Study on the *de minimis* issue. The Court considers below if the evidence

24   from these depositions is sufficient to create a triable issue of fact such that a reasonable jury

25   _____

26   [8] The Court notes that Rodriguez has offered a supplemental declaration of Dr. Kriegler in
     response to what Rodriguez characterizes as "new evidence" in Nike's reply brief and supporting
27   declarations regarding the reliability and bases for the Crandall Study in response to the Kriegler
     Report. *See* ECF 95, 95-1. To the extent that the Court considers the supplemental declarations of
28   Jon Meer and Robert Crandall (ECF 93-2, 94-1), the Court also considers Dr. Kriegler's
     supplemental declaration.

1  could find for Rodriguez and the certified class on the issue of whether the time spent undergoing

2  exit inspections is *de minimis*.

3  ### C.       Whether Time Spent On Exit Inspections Is *De Minimis*

4         The Court now turns to the *Lindow* factors to determine whether the time spent by Nike

5  retail store employees undergoing exit inspections is *de minimis* and therefore not compensable.

6  To determine whether time that would otherwise be compensable is *de minimis*, the Ninth Circuit

7  established a three-prong test instructing courts to consider "(1) the practical administrative

8  difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3)

9  the regularity of the additional work." *Lindow*, 738 F.2d at 1063.  The *Lindow* test "reflects a

10  balance between requiring an employer to pay for activities that it requires of its employees and

11  the need to avoid 'split-second absurdities' that 'are not justified by the actuality of the working

12  conditions.'" *Rutti v. Lojack Corp., Inc.*, 596 F.3d 1046, 1057 (9th Cir. 2010) (quoting *Lindow*,

13  738 F.2d at 1062).

14         Although it is not a stand-alone prong of the *Lindow* test, the Ninth Circuit also noted that

15  "[a]n important factor in determining whether a claim is *de minimis* is the amount of daily time

16  spent on the additional work." 738 F.2d at 1062.  No bright line or "rigid rule can be applied with

17  mathematical certainty" to determine whether periods of time are *de minimis* such that they need

18  not be compensated. *Lindow*, 738 F.2d at 1062.  "Rather, common sense must be applied to the

19  facts of each case." *Id*.  However, courts have regularly held that daily periods of up to 10 minutes

20  are *de minimis*. *Id*. at 1062 (collecting cases); *Alvarado v. Costco Wholesale Corp.*, Case No. 06-

21  04015, 2008 WL 2477393, at *3-5 (N.D. Cal. June 18, 2008); *Hubbs*, 2017 WL 2304751, at *8.

22         Courts have varied in their treatment of the daily amount of time under the *Lindow* test.

23  The Ninth Circuit in *Corbin* addressed the daily amount of time in conjunction with the aggregate

24  amount of compensable time. 821 F.3d at 1082.  The *Gillings* court similarly appeared to consider

25  the daily amount of time as one of the three factors. 583 Fed. App'x at 715 ("Although the

26  plaintiffs complain of non-payment for periods of time each very short, that circumstance does not

27  justify application of the *de minimis* doctrine without consideration of the other *two factors*

28  articulated in *Lindow*.") (emphasis added).  District courts have considered daily time in lieu of

aggregate time. *See, e.g., Troester v. Starbucks Corp.*, 2014 WL 1004098, at *4 (C.D. Cal. March 7, 2014).  Other district courts have distinguished "amount of time" from "aggregate time" and analyzed them as separate factors under the *Lindow* test.  *See, e.g.*, *Alvarado*, 2008 WL 2477393, at *3-5; *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2009 WL 2612307, at *25 (N.D. Cal. Aug. 24, 2009).  Moreover, at least one district court has interpreted *Lindow* as holding that "[w]hile the daily time involved in an activity is the chief concern in determining whether it is *de minimis*, courts also consider" the three *Lindow* factors.  *Farris v. Cty. of Riverside*, 667 F. Supp. 2d 1151, 1165 (C.D. Cal. 2009).

The Court begins its analysis by considering the duration of each individual exit inspection because the parties direct the majority of their evidence at this factor and it has implications for the remaining *Lindow* analysis.  The Court then addresses the evidence in the record on administrative difficulty, aggregate amount, and regularity to determine whether Rodriguez's claims are *de minimis* as a matter of law.  As stated above, Nike bears the burden of proving the applicability of the *de minimis* doctrine at trial. *See Gillings*, 583 Fed. App'x at 714 (citing *Rutti*, 596 F.3d at 1057 n.10).  As the moving party on summary judgment, Nike "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Id*. at 715 (quoting *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).  Where Nike has met its initial burden, the burden shifts to Rodriguez to produce evidence to raise a genuine issue of material fact on the *de minimis* issue.  *Celotex*, 477 U.S. 317, 323 (1986).  Even viewing the evidence in the light most favorable to Rodriguez and the certified class, the Court finds that the *Lindow* factors support Nike's position and no triable issue of fact exists such that a reasonable jury could find for Rodriguez and the certified class on the *de minimis* doctrine.  Thus, the Court GRANTS Nike's motion for summary judgment.

### 1.    Amount of Time

In the record before the Court, there is evidence from the Crandall Study and testimony from the depositions of Nike store managers regarding the amount of time each exit inspection took.  Nike argues that it is undisputed that an employee's off-the-clock time spent undergoing an exit inspection "lasted mere seconds" in each instance. Mot. 16.  As summarized above, Nike has

19

offered evidence through the Crandall Study to demonstrate that the combined average exit time extrapolated to the entire class is between 16.9 seconds and 20.2 seconds per exit.  Crandall Decl. ¶¶ 108-110.  Broken down, Nike submits that the average waiting time per exit was between 12.6 seconds and 15.8 seconds, the average visual inspection per exit was between 2.7 seconds and 3.5 seconds, and the average bag check was between 6.8 seconds and 8.2 seconds. *Id*. ¶¶ 69-72, 88-90, 99-101.  Nike concludes that "the statistics from the time and motion study show that the exit inspections took only a matter of seconds at each stage, and certainly less than one minute for virtually every exit." Mot. 13.[9]

There is also evidence in the record that the exit inspections took longer than a few seconds.  The Nike store managers testified that each component of the exit inspection lasted up to a few minutes rather than seconds.  Nike store manager Brian Aquino testified that a visual inspection of an employee wearing a "full zipped jacket" would take "30 seconds to a minute." Aquino Depo. 46:5-16.  He further testified that a bag check takes "about a minute." *Id*. 46:17-22. In terms of waiting time, Aquino testified that "about 45 percent of the time" an employee would be required to wait a minute or two for a manager to become available and perform a security check, but a wait of five minutes is rare. *Id*. 52:12-16.  According to Aquino, another 15 to 20 percent of the time an employee would have to wait between two and five minutes for the manager to conduct the check. *Id*. 52:17-24.  Aquino testified that 30 to 35 percent of the time an employee's wait time would be under one minute. *Id*. 53:1-9.  As detailed above, Nike store managers Megan Roos and Michael Ruybal also testified that waiting time, when it occurred, was

---

[9] Even considering Nike's recalculation of the Crandall wait and inspection times based on the Kriegler critique, Nike still posits that the combined exit inspection time would be an average of 22 seconds. ECF 93-2 ¶ 11 (recalculating times to include "other" time that Kriegler argued was improperly excluded due to "judgment calls" in the Crandall Study).  Moreover, putting aside the in-person observations which Dr. Kriegler found unreliable, it is undisputed that the Crandall Study's average combined exit inspection time based solely on video observations was 23.1 seconds. *Id*. ¶ 20.  Dr. Kriegler does not dispute this recalculation of time but takes issue with Nike's use of "average" and "median" times which he argues do not address "*how often* the security check process would result in a measurable impact on wages." ECF 95-1 ¶ 13 (emphasis in original). This critique corresponds with *Lindow*'s regularity prong, discussed below.

1   often at least one minute and could be as long as five minutes.  Roos Depo 89:2-4, 91:21-92:20.;

2   Ruybal Depo. 39:13-17.  However, neither Roos nor Ruybal testified regarding how long the exit

3   inspection takes when there is no waiting time, meaning when a manager is already at the exit and

4   available to conduct the inspection.  Rodriguez argues that the testimony of Aquino, Roos and

5   Ruybal demonstrates that the exit inspections "routinely took several minutes," mostly due to the

6   time spent waiting for a manager to arrive at the front of the store to perform the inspection. Opp'n

7   13.[10]

8        In sum, although Nike contends that the inspections took an average of 18.5 seconds per

9   exit, as supported by the Crandall Study, there is evidence from the deposition testimony that

10  many of the exit inspections took significantly longer.  Moreover, Dr. Kriegler's Report concludes

11  that over 10 workdays, class members "almost surely have one or more workdays with a minute or

12  more of uncredited time." Kriegler Decl. ¶ 42.  Therefore, viewing the evidence in the light most

13  favorable to the nonmoving party, the Court can only conclude that it is undisputed that an exit

14  inspection takes between zero seconds and several minutes.  The Court notes that even several

15  minutes of daily time may properly be considered *de minimis* and not compensable. *See Lindow*,

16  728 F.2d at 1062 ("Most courts have found daily periods of approximately 10 minutes *de minimis*

17  even though otherwise compensable."); *Farris v. Cty. of Riverside*, 667 F. Supp. 2d 1151, 1165

18  (C.D. Cal. 2009) ("10 minutes is the standard threshold for determining whether something is de

19  minimis"); *Alvarado*, 2008 WL 2477393, at *3 (finding plaintiff's claim to be *de minimis* despite

20  her testimony that bag checks took "a couple of minutes" and wait times could last "several

21  minutes.")

22       However, the *de minimis* inquiry does not end merely because the amount of time at issue

23  is short in each instance.  The Ninth Circuit has explicitly stated that "non-payment for periods of

24  time each very short…does not justify application of the *de minimis* doctrine without

25  consideration of the two other factors articulated in *Lindow* as pertinent to application of the *de*

---

[10] Nike argues that the deposition testimony shows that none of the managers believed the combined exit inspection process took longer than one minute "the majority of the time." Reply 3. This argument addresses the regularity prong of the *Lindow* test, discussed below.

United States District Court
Northern District of California

*minimis* doctrine in wage cases." *Gillings*, 583 F.App'x at 715 (citing *Rutti*, 596 F.3d at 1058); *accord Hubbs*, 2017 WL 2304751, at *8 ("Periods of approximately ten minutes per day may be properly treated as *de minimis,* when there is a practical administrative difficulty recording the time, and/or the amount of time varies from day to day.")  The administrative difficulty and regularity prongs of the *Lindow* test are particularly important, where, as here, the parties presented evidence on the amount of time on a "per exit" basis.  Thus, there is an absence of evidence on the "daily" or "aggregate" amount of time that a Nike employee spends undergoing exit inspections.  The Crandall Study and deposition testimony are only evidence that *each exit* involves a short amount of time.  Therefore, the Court turns to the remaining *Lindow* factors to determine if Nike is entitled to summary judgment on the *de minimis* doctrine.

### 2.    Practical Administrative Difficulty

In order to satisfy the next prong of the *Lindow* test, Nike must offer evidence of the practical administrative difficulty of recording the time spent by employees in connection with exit inspections. *See Lindow*, 738 F.2d at 1062-63 ("The *de minimis* rule is concerned with the practical administrative difficulty of recording small amounts of time for payroll purposes. Employers, therefore, must compensate employees for even small amounts of daily time unless that time is so miniscule that it cannot, as an administrative matter, be recorded for payroll purposes.")  The district court in *Troester* held that the administrative difficulty prong favors the defense "when the employer's timekeeping system cannot be practically configured to capture the alleged off-the-clock work." 2014 WL 1004098, at *4.

Here, Nike points to evidence that its timekeeping system does not allow time to be recorded in increments less than one minute. Meer Decl., ECF 84-2 Ex. A, Class Certification Hearing Transcript 14:16-18.  Nike further argues that it is impractical to move its time clocks, which are currently located in the back of its retail stores, to the area of the store exits in the front where exit inspections are conducted. *Id*. 6:23-7:2. Nike's designated corporate witness, Michael Steele, testified that Nike made the decision to keep time clocks in the back of the store for business reasons. Lee Decl. Ex. P ("Steele Depo." 56:6-10.  Steele testified that "[t]ime clocks are best placed off the sales floor" due to privacy concerns related to the employees' information. *Id*.

1    Steele further testified that there are benefits to placing the time clocks in the break room, which

2    allows employees to clock in and out after their break periods. Steele Depo. 56:12-18.  In sum,

3    there is evidence in the record that Nike's timekeeping system cannot manage employees by the

4    second, and Nike perceives a business benefit to keeping the time clocks solely in the break rooms

5    rather than in the front of the store.

6          Rodriguez responds that Nike's entire administrative difficulty argument is premised on

7    the Crandall Study's finding that exit inspections take "mere seconds." Opp'n 21.  As explained

8    above, Rodriguez has presented evidence that the amount of time spent in connection with exit

9    inspections took up to a few minutes rather than seconds.  Rodriguez also argues that Nike has not

10   shown that it is technically impossible to place an additional time clock at the front of the store or

11   at cash registers that are close to the front of the store. *Id*.  Rodriguez points to examples where

12   other major retailers such as Dick's Sporting Goods and Under Armour decided to either place an

13   additional time clock at the front of the store or to allow employees to clock out from the cash

14   register in order to compensate employees for security checks. *Id*. 22.  Rodriguez also provides

15   photographs of Nike retail stores where cash registers are out on the floor of the store to refute

16   Nike's argument that the time clocks cannot also be located on the sales floor for privacy reasons.

17   Opp'n 23.  Rodriguez further points to Steele's testimony stating that the time clock only contains

18   the name and ID number of the employee, which Rodriguez argues is less "confidential" than the

19   information contained in the cash registers. *Id*.  To ensure that the time spent undergoing exit

20   inspections is recorded, Rodriguez promotes the use of an additional clock by the store exit. *Id*.

21   As additional alternatives, Rodriguez suggests that Nike perform the security checks at the back of

22   the stores before its employees clock out, and then have managers escort or monitor the employees

23   as they exit.  Rodriguez also suggests that Nike could add a set amount of time to the paycheck of

24   each employee to ensure that everyone is compensated for time spent undergoing exit inspections.

25   *Id*. 24.

26          Nike relies heavily on *Corbin* to argue that the *de minimis* doctrine does not require an

27   employer to implement changes to capture time increments in seconds. Reply 14.  In *Corbin*, the

28   Ninth Circuit held that all three *Lindow* factors supported the district court's conclusion that

United States District Court
Northern District of California

23

plaintiff's "one minute" of off-the-clock time was *de minimis*. 821 F.3d at 1081.  The Ninth Circuit found that the administrative burden on the employer to record the additional time was high, and rejected the plaintiff's "baseless" contention that the employer could conceivably ascertain the additional time by "scouring its computer records." *Id*. at 1082.  Rather, the Ninth Circuit held that "the *de minimis* doctrine is designed to allow employers to forego just such an arduous task." *Id*.  Here, there is evidence in the record that some of the exit inspections took minutes rather than seconds.  Therefore, Nike's evidence that its systems cannot administratively capture time in seconds is not determinative on this factor.  However, the Court credits Nike's evidence that repositioning the time clocks would be administratively impracticable. Mot. 14.  In light of evidence in the record regarding Nike's timekeeping system and its business considerations for having employees clock in and out in the break room, the Court finds that Nike has met its initial burden of production that it would be administratively difficult to record the time spent on exit inspections.

Rodriguez's evidence does not create a triable issue of fact on the administrative difficulty prong.  Rodriguez focuses on the testimony of Nike's designated corporate witness where he admitted there is no "technical reason" why an additional timeclock could not be placed at the front of the store. Opp'n 21; Steele Depo. 55:23-56:5.  In light of *Corbin*, which explicitly rejected plaintiff's technical feasibility argument as "baseless" on this prong, Rodriguez's evidence that Nike has the technical ability to change its timekeeping system is misplaced. 821 F.3d at 1082 ("Corbin's contention that the *de minimis* doctrine does not apply because TWEAN *could* ascertain the exact log-in/out times by scouring its computer records is baseless; the *de minimis* doctrine is designed to allow employers to forego just such an arduous task.")  In order to prevail on this prong, Nike need not prove it is "technically infeasible" to record the additional time; only that it would be administratively difficult to do so given its timekeeping system.  Rodriguez's evidence that Nike already utilizes two time clocks in break rooms in its busier stores, or that other retailers have decided to place an additional time clock by the store exit, does not refute Nike's evidence that such a change would be administratively difficult.  *See Alvarado*, 2008 WL 2477393, at *3-4 (holding that the administrative difficulty prong favored Costco, and rejecting

United States District Court
Northern District of California

1    plaintiff's argument that "merely by repositioning the time clock close by the exit door, Costco

2    could more accurately measure the amount of time its employees were on the job.")

3           In fact, because the time it takes for an employee to walk from the break room in the back

4    of the store to the store exit is not at issue in this case, the administrative difficulty prong favors

5    Nike even more.  Rodriguez's suggestion would require an employee to clock out in the break

6    room, and then clock back in at the store exit in order to record the exit inspection time, only to

7    clock out for a second time after the exit inspection concludes.  Where an employee does not carry

8    a bag and only undergoes a visual inspection, it could take longer for an employee to clock back in

9    and out to record the time than it would take for the visual inspection itself.  Rodriguez provides

10   no evidence to show how this configuration would pose less administrative difficulties for Nike.

11   Given the evidence in the record, it is undisputed that it would be administratively difficult for

12   Nike to reconfigure its existing timekeeping system to conduct exit inspections "on-the-clock."

13   Therefore, no reasonable juror could find for Rodriguez on this prong. *Accord Hubbs*, 2017 WL

14   2304751, at *9 (crediting defendant's evidence that "calculating the time employees waited for a

15   bag check would be administratively difficult because those employees had already clocked out

16   for the day, and the time between clocking out and leaving the building varied from day to day and

17   was often of very short duration.")

18                  **3.     Aggregate Amount**

19           As *Lindow* is a multi-factor test, and no single factor is determinative, the Court next

20   considers the size of the aggregate claim.  "Courts have granted relief for claims that might have

21   been minimal on a daily basis but, when aggregated, amounted to a substantial claim." *Lindow*,

22   738 F.2d at 1063.  The aggregate size of the claim is important because it "would promote

23   capricious and unfair results" to consider only the daily amount of unpaid time at issue. *Id.*

24   (reasoning that it is unjust to compensate "one worker $50 for one week's work while denying the

25   same relief to another worker who has earned $1 a week for 50 weeks.")  However, even if an

26   aggregate claim is substantial, the time may still be *de minimis* because of the administrative

27   difficulty of recording the time and the irregularity of the additional work. *Id.* at 1064.  When there

28   is evidence that the aggregate claim is insubstantial, "we may dismiss it as groundless and

                                                      25

unreasonable." *Id*. at 1063.

As discussed above, the Crandall Study provides evidence of the amount of time that an exit inspection took *in each instance*.  The Court must also consider the "daily" and "aggregate" amount of compensable time at issue, which Nike argues is still *de minimis*.  The Crandall Study notes that "[s]ome of the 862 employees included in the study had multiple store exits –e.g., exits for rest periods, exits for meal periods, exits at the end of a shift, and exits at the time the store closed." Crandall Decl. ¶ 58.  Other employees may have only had a single exit from the store because they "did not work enough hours to qualify for a rest period or meal period" or they "chose to remain in the store" during those periods and only exited at the end of their shift. *Id*. Therefore, even if the Court credits Crandall's finding that each exit takes only a few seconds on average, the Court must consider whether employees leave the store multiple times each day or if the aggregate claim is large over a longer period of time.

There is "no precise amount of time" that is considered *de minimis* per se. *Lindow*, 738 F.2d at 1062.  Still, Nike argues that "every other court to address the [*de minimis*] issue has held that off-the-clock periods of less than one minute are not compensable." Mot 18.  Again, the Court views the evidence in favor of Rodriguez and the class, who have presented evidence that the exits could take up to several minutes in some instances.  The Court then considers the size of this claim on a "daily" basis.  *See Lindow*, 738 F.2d at 1062 ("[m]ost courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable."); *Farris*, 667 F. Supp. 2d at 1165 (noting that the "daily time involved in an activity is the chief concern in determining whether it is de minimis").  Although the parties agree that some employees qualified for mandatory meal/rest breaks, it is not clear how often employees leave the store in a single day.

Dr. Kriegler finds that Nike's timekeeping data shows the number of workdays with "multiple punch-outs" during the class period. Kriegler Decl. ¶ 36, Ex. 5.  However, "multiple punch-outs" is defined as "two or more" punch-outs in a day, "*i.e.*, one punch-out for a meal break and one punch-out at the end of the workday." *Id*.  Dr. Kriegler's analysis of Nike's timekeeping data shows that over the course of the period from July 2011 through March 2017, "83.0 percent of employees worked 10 or more days with multiple punchouts" and "61.7 percent of employees

worked 30 or more days with multiple punch-outs." *Id*.  This analysis was conducted to calculate the probability that an employee would experience a workday with at least 60 seconds of uncredited time.  However, these percentages do not indicate how many times an employee leaves the store each day, or if an employee ever leaves more than twice in a single day.

Drawing all reasonable inferences in favor of Rodriguez, the daily amount of time is still well within the 10-minute *de minimis* threshold.  Even if an exit inspection occasionally lasts a few minutes, and an employee exits twice a day (once for a meal/rest break, and once at the end of the workday, as Dr. Kriegler suggests), an employee would still spend less than 10 minutes a day in connection with exit inspections.  If the Court assumes that an employee leaves *more than* twice a day, which there is no evidence to support, it would still take multiple exits to reach 10 minutes per day.  For example, an employee would have to undergo a two-minute exit inspection five times a day, or a three-minute inspection four times a day, in order to surpass 10 minutes of "daily" time spent undergoing exit inspections.  And such a hypothetical experience is neither found in the evidence nor plausible.  Moreover, the record indicates that exit inspections lasting over 60 seconds were not regular, which further supports a finding that the "daily" amount of time involved is *de minimis*.  Dr. Kriegler himself opines that there is only a 67% probability that out of 10 exits, at least one involved a combined time of at least 60 seconds. Kriegler Decl. ¶ 35.  Thus reducing the plausible daily time to well below five minutes.

As for the aggregate amount of time over periods longer than a day, the Crandall Study shows that the average exit inspection time is between 16.9 seconds and 20.2 seconds, with a median time of 4.7 seconds. Crandall Decl. ¶¶ 108-111.  Nike extrapolates this evidence to establish that the aggregate amount of uncompensated time at issue is miniscule.  Moreover, Dr. Kriegler can at most show that he is only confident that one in 30 exits results in a bag check that exceeds 60 seconds. Kriegler Decl. ¶ 34, Table 2.  Dr. Kriegler concedes that those 30 exits might occur over a six-month period of time. Kriegler Dep. 107:17-22.  Thus, the undisputed evidence indicates that it could take more than a pay period for an employee to experience an exit inspection that reaches 60 seconds. *Id*. 118:18-23.  Below is Dr. Kriegler's analysis of the probability that an employee has at least one combined exit time of at least 60 seconds:

27

| Table 2: Probability of at Least One Store Exit With a Combined Time of at Least 60 Seconds | |
| --- | --- |
| Number of Store Exits | Probability |
| 1 | 10.5% |
| 5 | 42.6% |
| 10 | 67.0% |
| 15 | 81.1% |
| 20 | 89.1% |
| 25 | 93.8% |
| 30 | 96.4% |

Kriegler Decl. ¶ 34, Table 2.

Based on the evidence in the record, it is undisputed that the "daily" amount of compensable time at issue is small and within the amount of time that courts have found to be *de minimis*. The only reasonable inference from the Crandall Study and Kriegler Report is that the "aggregate" amount of compensable time is also small. However, regardless of whether the aggregate is small, which would favor Nike, or large, which would favor Rodriguez and the class, the *Lindow* court made clear that even when an aggregate claim is substantial, a claim may still be considered *de minimis* "because of the administrative difficulty of recording the time and the irregularity of the additional [] work." 738 F.2d at 1063.

### 4.      Regularity

Finally, the Court considers whether the employees performed the uncompensated work on a regular basis. *Lindow*, 738 F.2d at 1063. Nike offers evidence that exit inspections often involved no time at all. Mot. 19. The Crandall Study found that 60.5% of exit inspections involved zero seconds of waiting time. Crandall Decl. ¶¶ 60-63. As for visual inspections, 52% of the visual inspections were one second or less. *Id*. ¶ 82. This is because visual inspections can be "split second events" where the employee "may not need to break stride upon exit." *Id*. ¶ 79. All "split-second" visual inspections that could consist of a "glance" of an authorized supervisor were recorded as one second in the Crandall Study. *Id*. ¶¶ 79-81. Moreover, Nike presented evidence that bag checks did not occur regularly because out of all of the exits recorded in the Crandall Study, 51% of the exits did not involve a bag check. *Id*. ¶ 78. Bag checks of any duration only occurred 45.5% of the time.  *Id*. ¶ 92. As for combined time, the Crandall Study demonstrated that

1    21.5% of the exits involved no time at all and were considered "walk-outs" with no measurable

2    time for waiting, visual inspections, or bag checks. *Id*. ¶ 103.  This evidence supports a finding

3    that exit inspections of no measurable amount of time were frequently conducted.

4        Even if the Court were to consider the criticisms in the Kriegler Report, the Crandall Study

5    still demonstrates that compensable exit times lasting at least 60 seconds did not occur regularly.

6    Dr. Kriegler concedes that "60 seconds is relevant because Nike's timekeeping and payroll

7    systems measure time to the whole minute.  It follows that an additional 60 seconds of time on the

8    clock would have a measurable impact on wages." Kriegler Decl. ¶ 34.  The Kriegler Report

9    accepts that if the Crandall Study is taken at face value, there is only a 10.5% probability that a

10   given exit inspection would have a combined time of at least 60 seconds. *Id*. ("Based on Mr.

11   Crandall's video footage, there is a 10.5 percent chance that Combined Time will be at least 60

12   seconds.")  Thus, the evidence in the record demonstrates that there is at least an 89.5%

13   probability that a given exit inspection takes less than 60 seconds. *Id*.  Kriegler further opines that

14   it takes 30 exits to obtain a 96.4% probability that at least one of those exits took 60 seconds or

15   more. Kriegler Decl. ¶ 35, Table 2.  The Crandall Study itself concluded that 92.2% of exit

16   inspections recorded had a combined time of less than 60 seconds.  Crandall Decl. ¶ 106.

17       Rodriguez does not present any evidence to create a triable issue of fact on the regularity of

18   the additional time.  Rodriguez relies solely on his argument that the "unpaid work" is regular

19   because employees are required to undergo a security check every time they leave the store. Opp'n

20   25.  The Court declines to interpret the regularity prong of the *Lindow* test in such a manner.

21   Rather, the proper consideration is the regularity of exit inspections that were compensable. *See*

22   *Lindow*, 738 F.2d at 1064 ("[A]lthough plaintiffs reported early on a regular basis, they did not

23   regularly engage in compensable activities."); *see also Corbin*, 821 F.3d at 1082.  The Ninth

24   Circuit further noted in *Lindow* that "the uncertainty of how often employees performed the tasks

25   and of how long a period was required for their performance are also relevant" on the regularity

26   prong. 738 F.2d at 1063.

27       Viewing the evidence in the light most favorable to Rodriguez and the certified class, the

28   deponents testified that wait times and bag checks could take several minutes in some instances.

United States District Court
Northern District of California

29

United States District Court
Northern District of California

However, Rodriguez offers no evidence that such lengthy inspections occurred with regularity.  As Nike points out, the store managers' testimony confirms the Crandall Study's finding that the vast majority of exits take less than one minute. Reply 2-3.  Even crediting the Kriegler Report, there is no evidence to rebut the Crandall Study's conclusion that (1) many exit inspections took zero seconds; and (2) exit inspections lasting more than 60 seconds were not regular.  Notably, the Kriegler Report did not even consider the length of exits in any increment beyond 60 seconds.  Meer Decl., ECF 94-1 Ex. D ("Kriegler Depo.") 85:21-23, 122:21-25 (explaining that the "highest cutoff" used "was 60 seconds because of Nike's timekeeping system.")  And in his own analysis of Nike's timekeeping data, Dr. Kriegler calculates that it would take 10 workdays for a class member to experience a workday with one minute or more of uncredited time, which is not evidence of regularity. *See* Kriegler Decl. ¶ 42.

In light of the above, Nike has put forth evidence that its employees did not work "off-the-clock" every time they exited the store.  Moreover, the Crandall Report demonstrates that exit inspections lasting "several minutes" as the store managers suggest were also not regular.  The burden then shifts to Rodriguez, who fails to offer evidence to create a genuine issue of material fact that compensable exit inspections occurred regularly.  Therefore, it is undisputed that exit inspections often took zero seconds, and any inspection lasting over 60 seconds (which Nike's timekeeping system could conceivably record) was not regular.  As such, the regularity prong heavily favors Nike on summary judgment.

Under the *Lindow* analysis, the factors "uniformly lean in favor" of Nike. *Corbin*, 821 F.3d at 1082.  It is undisputed that an exit inspection generally takes a few seconds, but can take up to a few minutes.  It is also undisputed that compensable exit inspections lasting 60 seconds or more were irregular, and the only reasonable inference from the evidence is that the daily and aggregate amount of compensable time is small.  There is also evidence that it would be administratively difficult for Nike to record the exit inspections given its timekeeping policies.  Based on the record before the Court, the *de minimis* doctrine applies and no reasonable jury could find that the claims at issue are compensable.

1

IV.   ORDER

2

      For the foregoing reasons, Nike's motion for summary judgment against the certified class

3

is hereby GRANTED.[11]

4

5

Dated:  September 12, 2017

6

                                               _____

7

                                               BETH LABSON FREEMAN
                                               United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_____

[11] The *de minimis* doctrine bars all of Rodriguez's claims including failure to pay minimum wages pursuant to Cal. Lab. Code §§ 1194, 1197; failure to pay overtime wages pursuant to Cal. Lab. Code §§ 510, 1194; restitution of unpaid wages pursuant to Cal. Bus. & Prof. Code § 17200; and waiting time penalties pursuant to Cal. Lab. Code § 203.

United States District Court
Northern District of California